[Cite as *State v. Daley*, 2014-Ohio-2128.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,              CASE NO. 13-13-26

      v.

RANDALL J. DALEY,                   O P I N I O N

      DEFENDANT-APPELLANT.


Appeal from Seneca County Common Pleas Court
Trial Court No. 12CR0094

Judgment Affirmed and Cause Remanded

Date of Decision: May 19, 2014


APPEARANCES:

    *John M. Kahler, II* for Appellant

    *Derek W. DeVine* for Appellee

**WILLAMOWSKI, P.J.**

{¶1} In this criminal appeal, Defendant-appellant Randall J. Daley ("Daley") challenges the judgment of the Court of Common Pleas in Seneca County, Ohio, which entered his conviction after a jury found him guilty of endangering children and kidnapping, and sentenced him to six years in prison. Daley asserts errors by the trial court as well as ineffective assistance of counsel. He further claims that the jury's findings were against the manifest weight of the evidence. For the reasons that follow, we affirm the trial court's judgment. We remand the case to the trial court, however, for correction of clerical errors included in the sentencing judgment entry.

*Statement of Facts*

{¶2} On Sunday evening, July 10, 2011, a twenty-two-month old girl, S.E.D., was brought to the Fostoria Community Hospital emergency room by Daley and his girlfriend, Tellina Tenney ("Tenney"). The child was lethargic and not moving much, and her body temperature was 105.4. S.E.D.'s body was severely bruised and her skin was bright red from the breast line down. Some of the bruises looked older while others seemed fresh. Daley identified himself as S.E.D.'s father and informed the hospital staff that the child fell onto a toy.

{¶3} The hospital suspected child abuse and notified the Fostoria Police Department. Two officers, Cory Bryan and Colin Taggert, were sent to the hospital for investigation. The officers observed S.E.D. during her treatment and

took photographs to document her injuries. They also talked to Daley and Tenney, who told them that Tenney's dog had knocked down S.E.D, and she fell on one of her toys, sustaining bruises. The couple had no explanation for the child's skin discoloration. After the initial treatment in Fostoria, S.E.D. was taken to a hospital in Toledo.

{¶4} Shortly after midnight on July 11, 2011, the two officers met with Daley and Tenney at the police station for further interviews. The officers questioned Daley and Tenney separately, but the two continued to claim that S.E.D. had been knocked down by the dog. They also explained that the child was given a bath that night but the bath water was warm, not hot. They claimed that S.E.D. became unresponsive during the bath. There were inconsistencies in their statements regarding who gave the child the bath and how exactly S.E.D. became unresponsive.

{¶5} The investigation was transferred to Seneca County Sheriff's Office, where Detective Kevin Reinbolt was assigned to the case. Detective Reinbolt learned that S.E.D. was not Daley's biological daughter, although Daley was listed as the father on S.E.D.'s birth certificate and had visitation rights pursuant to an agreement with S.E.D.'s mother who lived in Findlay, Ohio.

{¶6} At some point in the investigation, Tenney admitted to detective Reinbolt that she had abused S.E.D. This admission resulted in Tenney's arrest. When Tenney was in the county jail, Daley signed two confession letters in which

he admitted that he had abused S.E.D., and claimed that Tenney was not involved in the abuse. The letters were sent to Tenney. Later on, when Tenney was represented by an attorney, and was promised that what she said was not going to be used against her, she gave Detective Reinbolt additional information, not previously disclosed, indicating further abuse of S.E.D. by both Tenney and Daley during the weekend of July 8, through July 10, 2011. Among others, she described an incident of leaving S.E.D. locked in her room, while the couple left the house to go to Walmart, and an incident of sexual abuse of S.E.D. by Daley. Tenney entered a plea of guilty to two counts of child endangering and agreed to testify against Daley.

{¶7} The following charges were then brought against Daley.

COUNT ONE

On or about the 8th day of July, 2011 , in Seneca County, Ohio, RANDALL J. DALEY, being the parent, guardian, custodian, person having custody or control, or person in loco parentis of S.E.D., a child under eighteen years of age, namely one year of age, did create a substantial risk to the health or safety of the said S.E.D., by violating a duty of care, protection, or support, and said violation resulted in serious physical harm to S.E.D.

This being in violation of Section 2919.22(A),(E)(2)(c) of the Ohio Revised Code and against the peace and dignity of the State of Ohio.

ENDANGERING CHILDREN: A Felony of the Third Degree

* * *

-4-

## COUNT TWO

On or about the 8th day of July, 2011, in Seneca County, Ohio, RANDALL J. DALEY did knowingly abuse S.E.D., a child, when S.E.D. is under eighteen, and said abuse resulted in serious physical harm to S.E.D.

This being in violation of Section 2919.22(B)(1),(E)(2)(d) of the Ohio Revised Code and against the peace and dignity of the State of Ohio.

ENDANGERING CHILDREN – A Felony of the Second Degree

* * *

## COUNT THREE

On or about the 10th day of July, 2011, in Seneca County, Ohio, RANDALL J. DALEY, being the parent, guardian, custodian, person having custody or control, or person in loco parentis of S.E.D., a child under eighteen years of age, namely one year of age, did create a substantial risk to the health or safety of the said S.E.D., by violating a duty of care, protection, or support, and said violation resulted in serious physical harm to S.E.D.

This being in violation of Section 2919.22(A),(E)(2)(c) of the Ohio Revised Code and against the peace and dignity of the State of Ohio.

ENDANGERING CHILDREN A Felony of the Third Degree

* * *

## COUNT FOUR

On or about the 10th day of July, 2011, in Seneca County, Ohio, RANDALL J. DALEY did knowingly abuse S.E.D., a child, when S.E.D. is under eighteen, and said abuse resulted in serious physical harm to S.E.D.

This being in violation of Section 2919.22(B)(1),(E)(2)(d) of the Ohio Revised Code and against the peace and dignity of the State of Ohio.

ENDANGERING CHILDREN – A  Felony of the Second Degree

\* \* \*

## COUNT FIVE

On or about the 10th day of July, 2011, in Seneca County, Ohio, RANDALL J. DALEY did have sexual contact with S.E.D., not the spouse of the said defendant, and the said S.E.D. being less than thirteen years of age, whether or not the said Randall J. Daley knows the age of S.E.D.

This being in violation of Section 2907.05(A)(4),(C)(2) of the Ohio Revised Code and against the peace and dignity of the State of Ohio.

GROSS SEXUAL IMPOSITION – A Felony of the Third Degree

\* \* \*

## COUNT SIX

On or about the 10th day of July, 2011, in Seneca County, Ohio, RANDALL J. DALEY did in the case of S.E.D., a victim under the age of thirteen, by any means, restrain the liberty of S.E.D., with purpose to engage in sexual activity, as defined in Section 2907.01 of the Revised Code with the said S.E.D. against S.E.D.'s will.

SPECIFICATION: The Grand Jurors do further find and specify that Randall J. Daley committed the offense with a sexual motivation.

This being in violation of Section 2905.01 (A)(4),(C)(3)(a) of the Ohio Revised Code and against the peace and dignity of the State of Ohio.

KIDNAPPING – A Felony of the First Degree

(R. at 10, Amended Indictment.)

{¶8} Daley pled not guilty and the matter proceeded to jury trial.  Due to the nature of the assignments of error we recite the relevant trial testimony.

*Trial Testimony*

{¶9} Nurse Romelia Kuyken, a.k.a. nurse McConnell, who worked at the ER when S.E.D. was brought in by Daley and Tenney, testified that S.E.D.'s body had bruises "all over" and her skin was "beet red" from along "like a straight line right across her breast line and down." (Jury Trial Tr. at 333.) She described S.E.D.'s wrists as having "ligature marks" on them, looking "like somebody had tied her down." (*Id.* at 334.) Those marks looked "like a perfect bruise line all the way around both the wrists," "just a straight line all the way around both of them," looking faint and yellow as if "they had been old bruises that were healing." (*Id.* at 334-336.)

{¶10} Officer Cory Bryan from the Fostoria Police Department, who conducted initial investigation of the case at the hospital, testified that he had observed S.E.D. from a distance of approximately eight or ten feet while she was undergoing medical tests. (*Id.* at 143-144.) He could see heavy bruising on her body, including her face and her head, as well as burning from "about mid-chest down, her entire body." (*Id.*) Officer Bryan confirmed that from his experience, the bruises looked older, as if they did not occur on July 10, 2011. (*Id.* at 178-179.) Officer Bryan talked to Daley in the hospital and was told that Tenney's dog, a Rottweiler, had knocked down S.E.D, causing the injuries. (*Id.* at 145-147.) Officer Bryan testified that Daley became "obviously nervous" and his answers "didn't really add up" when he was asked to explain the number of bruises and the

number of times the child had been knocked down. (*Id.* at 147.) Daley did not have an explanation for the redness on S.E.D.'s body. (*Id.* at 149.)

{¶11} Officer Bryan testified that he had spent about ten minutes taking photographs of the child and after that, he was still able to see "vividly" the redness on the child's body. (*Id.* at 148.) He spent a total of about five hours and twenty minutes in the hospital that night and during that time "the pinkness" on S.E.D.'s body began to "subside," although it was still visible. (*Id.* at 152-153.)

{¶12} Officer Bryan testified about the photographs taken that night. (*Id.* at 155.) He talked about the bruising on S.E.D.'s face depicted in the photographs and, based on his training and education, expressed an opinion that this kind of injury was caused by a human hand. (*Id.* at 155-156.) He described handprints visible on S.E.D.'s cheeks, bruising around her left eye, "petechiae,[1] in one of her eyes from being strangled," and injuries to S.E.D.'s forehead. (*Id.* at 156-157, 160.) He testified about the photograph depicting bruising on S.E.D.'s neck, commenting that it appeared to be a sign of "grabbing" or "strangling" her. (*Id.* at 161.) He talked about photographs that showed "[b]ruising around the top of the head, around the neck, scratches on her neck, bruising to her ears," and bruises to her chin. (*Id.* at 162-163.) The photographs of S.E.D.'s back showed multiple bruises, burns, and scratches, including bruising on the backside of S.E.D.'s left

---

[1] Although the term "petechiae" was not explained to the jury, we note that the term means "small reddish marks indicating ruptured blood vessels." *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 88. The officer's testimony was accompanied by the photographs illustrating to the jury the meaning of the officer's words.

arm. (*Id.* at 163-164, 167.) One of the photographs depicted markings that were "consistent with the bottom of a shoe as if somebody had struck her with a shoe." (*Id.* at 165.) Another photograph showed bruising to the right leg, just above the knee and up toward the hip. (*Id.* at 164.) A series of photographs demonstrated the red discoloration of S.E.D.'s body "from mid-chest down where she had been scalded." (*Id.* at 158, 162.) A total of forty-six photographs taken in the ER on July 10, 2011, depicting S.E.D.'s condition on that day, were admitted into evidence. (*Id.* at 155-168, 328.)

{¶13} Officer Bryan then testified about his interview with Daley conducted at the police station later that night, approximately eight hours after the child had been taken to the hospital. (*Id.* at 169-170.) Daley claimed that S.E.D. had been in his care since the Wednesday prior to the incident. (*Id.* at 171-172.) He continued to claim that S.E.D. had been knocked down by the dog, explaining that she did not have good balance and fell easily, sustaining bruises. (*Id.* at 170.) He attributed the injuries to S.E.D.'s face to her falling into a pile of toys. (*Id.* at 170.) Daley told the officer that he had put S.E.D. in bath water that was warm, not hot, and that Tenney "went in to wash her hair and to finish up the bath and then had brought her out saying that something was wrong with her, that she had fallen in the tub and hit her head and was unresponsive." (*Id.* at 171.) At no point during that interview did Daley indicate that Tenney had caused S.E.D.'s injuries, but he claimed that he was present when the described injuries took place. (*Id.* at

-9-

171.) On cross-examination, Officer Bryan admitted that the versions of events given by Daley and Tenney included "definite discrepancies." (*Id.* at 174-175.)

{¶14} Officer Colin Taggert, who worked with Officer Bryan on the night shift on July 10, 2011, when they were dispatched to Fostoria Community Hospital, also observed S.E.D.'s body covered in bruises and being a bright pink color from chest down. (*Id.* at 198.) He described S.E.D.'s other injuries, which included "bruising across her throat," petechiae in one of her eyes, "bruises on the side of her face that were in the shape of a palm," clearly showing the pressure points from the fingers, and "first degree burns from the nipple line all the way down." (*Id.* at 203.) Officer Taggert further described bruises on S.E.D.'s back, "white outline from what appeared to be a shoe," and miscellaneous other bruises. (*Id.* at 203-204.) He estimated that the bruising he observed looked like it was two or three days old. (*Id.* at 204.)

{¶15} Officer Taggert then testified about the hospital interview with Tenney, when she claimed that her dog had knocked S.E.D. over into one of her toys causing bruising to her face and that the bath water for S.E.D. that night was "lukewarm." (*Id.* at 200-201.) He also testified about the later interviews at the police station, which took place shortly after midnight on July 11, 2011. At that time, Daley told Officer Taggert that he had witnessed S.E.D. sustain the injuries from the dog and a toy LeapFrog table, but he was still unable to explain the burns over S.E.D.'s body. (*Id.* at 208.) On cross-examination, Officer Taggert was

asked about Tenney's demeanor at the hospital and described it as "evasive," stating that "she kept rambling on," as if she was nervous. (*Id.* at 209-210.) He also described an inconsistency revealed during the interviews over who was present during S.E.D.'s bath when she became unresponsive. (*Id.* at 210-213.)

{¶16} Susan Turner, a critical care physician from the pediatric critical care unit at the Children's Hospital in Toledo, treated S.E.D. on July 11, 2011. (*Id.* at 181-183.) Ms. Turner testified that when S.E.D. was brought in, "she was covered in bruises, head to toe." (*Id.* at 183-184.) The bruises were different colors and indicated that they had occurred at various times, within two to five days. (*Id.* at 184-185.) Ms. Turner stated that her examination of the child, coupled with her training and experience, excluded the possibility of the bruises being caused by falling onto a toy. (*Id.* at 186.) She also excluded the possibility of the child being knocked down by a dog or falling in a tub and hitting her head. (*Id.* at 187.) She testified that both the old and the new injuries caused S.E.D. serious physical harm to a reasonable degree of medical certainty. (*Id.* at 184-185, 193.) When asked about the older bruises, Ms. Turner commented that they were extensive, multiple, and indicated that they had caused physical harm, involving "acute pain," "substantial suffering or prolonged or intractable pain." (*Id.* at 185.) Likewise, the newer bruises also caused "temporary, substantial incapacity" and involved physical harm, "acute pain," and "substantial suffering." (*Id.* at 186.)

{¶17} Ms. Turner testified that S.E.D.'s temperature, which was noted at 105.4 at her arrival into the ER, was consistent with a child being dipped in a hot tub, which would create the risk of serious physical harm to the child. (*Id.* at 188.) Ms. Turner testified that a child held in hot water that raises the child's body temperature to 105.4 "would probably seize" as a result. (*Id.* at 188-189.) She could not say that a seizure actually occurred in S.E.D.'s case, but the symptoms of complete lethargy, which S.E.D. exhibited when she arrived at the hospital, were consistent with a child who had been held in a hot tub. (*Id.* at 189, 191.)

{¶18} Tenney testified as a witness for the State. At the time of the trial, Tenney was incarcerated after pleading guilty to two counts of endangering children for her role in causing serious physical harm to S.E.D. on July 8 and July 10, 2011. (*Id.* at 224-246.) Tenney testified that in July 2011, S.E.D. was an infant who was presumed to be Daley's daughter. (*Id.* at 226-273.) Although S.E.D. lived with her mother in Findlay, she visited with Daley and Tenney in Fostoria approximately every weekend. (*Id.* at 226-227.) S.E.D. stayed with Tenney and Daley from July 1, 2011, until July 10, 2011, when she was taken to the hospital. (*Id.* at 227-229, 259-260.)

{¶19} Tenney admitted that both she and Daley abused S.E.D. during the weekend of July 8 through July 10, 2011. She admitted that she had hurt the child by slapping, punching, kicking, hitting, and pinching her. (*Id.* at 243.) She then described an incident that occurred on Friday, July 8, 2011, when Daley pinched

S.E.D.'s cheeks during feeding because "she wasn't swallowing her food when she was supposed to." (*Id.* at 229.) Tenney claimed that Daley became frustrated and "jammed" a spoon into S.E.D.'s mouth, in response to which S.E.D. bit Daley's finger and "he slapped her in her face three times," instantly bruising it. (*Id.* at 230-231.)

{¶20} Tenney described another incident that occurred during the course of the same weekend. On Saturday evening, July 9, 2011, upon coming out of the shower, she saw that S.E.D. was naked and had her hands tied behind her back with a dog choker chain. (*Id.* at 232.) Daley had his legs on top of S.E.D.'s legs "so she couldn't move," he had a vibrator in his hand, and he engaged in what appeared to be a sexual behavior with S.E.D. (*Id.* at 232.) Daley did not stop even though he saw Tenney, and she did not do anything to help S.E.D. (*Id.* at 234.)

{¶21} Tenney testified about other "minor" incidents when she saw Daley hit, pinch, and poke S.E.D. (*Id.* at 243.) She admitted that S.E.D. was placed in hot and cold water more than once, by both of them. (*Id.* at 243.) Tenney confessed to leaving S.E.D. at home alone, locked in her bedroom when the two were leaving the trailer. (*Id.* at 244.) She admitted that the bruises on S.E.D.'s face, legs, and back were the result of abuse by both Tenney and Daley. (*Id.* at 247-248.) Tenney testified that Daley never stopped her from hitting his child. (*Id.* at 274.)

{¶22} Tenney described the bathing incident on Sunday evening, July 10, 2011, stating that she ran bathwater, which was lukewarm, and then Daley gave S.E.D. a bath while she left the bathroom to cook dinner. (*Id.* at 234-238.) When she heard S.E.D. cry, she went to the bathroom and saw that the water was up to S.E.D.'s breastbone and that Daley was holding her by her hips. (*Id.* at 238-239.) She walked out of the bathroom to finish dinner, but a few minutes later, Daley came out of the bathroom with S.E.D. who was red from her breastbone down and who had passed out. (*Id.* at 239.) Daley "was panicking" and they took S.E.D. to the hospital. (*Id.* at 239.) Tenney testified that Daley's hands were scalded by water. (*Id.* at 271.)

{¶23} Tenney admitted that on the night of the incident, she had not been honest with the hospital staff or the police about how S.E.D. got hurt. (*Id.* at 240-241.) She admitted that she and Daley both lied about what had happened to S.E.D. the weekend of July 8 through July 10, 2011. (*Id.* at 263.) After leaving the hospital, she and Daley went back to the house and talked about the situation, discussing how "to keep up with the lie that she fell and that neither one of [them] did anything to harm her." (*Id.* at 240-241.) Tenney had discussions with Daley about how to avoid prosecution and about moving to West Virginia. (*Id.* at 250.) The discussions included a plan that if one of them got arrested, the other one would take the blame by saying they "did everything" in order to get the other out

of jail. (*Id.* at 251.) Tenney was arrested and incarcerated prior to her planned departure for West Virginia. (*Id.* at 250.)

**{¶24}** Tenney testified that she was aware of the confession letter, which was a typed statement with blanks filled out by Daley. (*Id.* at 251-252.) Tenney read the content of the statement for the jury and the letter was also admitted as the State's exhibit. (*Id.* at 253-254.) It read:

> I, *Randall Daley*, admit that I abused and neglected minor child, [S.E.D.]. The bruises on her face is from where she was slapped and punched. The bruises on her throat area is from where I strangled her. There were grab marks on her arms and back. I did dip her into hot water which caused the burns from her chest down. I was the only one who did this. *Tellina Tenney* lied to cover up for me because I threatened *her* life. *Tellina Tenney* had nothing to do with what happened to [S.E.D.] at all. I swear under oath this letter is true and correct.[2]

(State's Ex. 5.) Tenney attested that she recognized Daley's handwriting in the filled out portions and that the statement was signed by Daley . (Jury Trial Tr. at 252-254.) She denied being involved in the wording of the confession. (*Id.* at 265.) She admitted that certain spaces in the document were intentionally left blank, "like whose name was to go in there," so that either Daley's or Tenney's name could go in there, depending on which one of them would get arrested first. (*Id.* at 265-266.) She denied that it was her suggestion to prepare the document that way. (*Id.* at 266.) She testified that Daley typed it up and that she did not help in preparation of that statement although she was in the house when Daley

---

[2] Italicized portions represent the parts that were handwritten in the typed statement.

wrote the original typed portions of the statement and he talked to her about it. (*Id.* at 252-253.)

{¶25} Tenney further testified about another exhibit, which was a handwritten confession letter from Daley that he had mailed to her when she was in the county jail. (*Id.* at 254.) This document read:

> I Randall Daley do hereby confess to the slapping, beating, strangiling [sic] and burning of the minor child [S.E.D.] on or about July 8th 2011 I Randall Daley threatened Tellina Tenney into lieing [sic] about not knowing how the bruses [sic] happened Tellina Tenney was not at the resedence [sic] at the time the bruses [sic] appiered [sic] on [S.E.D.].

(State's Ex. 6; Jury Trial Tr. at 255-256.) Tenney attested that the handwriting in this document was Daley's and that the document was signed by both Daley and a witness, Ginger K. Bennett, who was their landlord. (Jury Trial Tr. at 255-256.)

{¶26} Tenney admitted that after her arrest she made dozens of phone calls to Daley, asking to get her out of jail; but she denied being upset about Daley not getting her out. (*Id.* at 266-269.) She testified that she stopped having contact with Daley after being charged with abuse of S.E.D., although she also admitted that she talked to him for the first three months when she was in jail, until he stopped answering her calls. (*Id.* at 248-249.)

{¶27} Tenney explained that she did not "come forward" with the truth about all the events at issue until after becoming incarcerated and after she had pled and had been given her "proffer" that what she would say was not going to be

used against her. (*Id.* at 263-264.) Nevertheless, she was given no offer of leniency from the prosecutor for testifying against Daley; she gave the statements voluntarily because she felt that "justice should be served for this child." (*Id.* at 246-247, 256-257.) She testified that she had a dog that lived in the house with them; it was a pit-bull mix. (*Id.* at 232.)

{¶28} Detective Kevin Reinbolt from the Seneca County Sheriff's office continued the investigation after July 10, 2011. He testified that he had visited Daley and Tenney in their residence and saw a dog, which he described as "a little puppy." (*Id.* at 309-310.) During an interview conducted on July 13, 2011, Daley told detective Reinbolt that he had left his house on Friday, July 8, 2011, for a couple of hours and upon coming back, he saw injuries on S.E.D.'s face. (*Id.* at 291.) He did not have an explanation for other injuries on S.E.D.'s body. (*Id.* at 292.) As to the bathing incident, Daley told Detective Reinbolt that Tenney drew the bath water and Daley put S.E.D. in the bathtub when the water was lukewarm. (*Id.* at 292.)

{¶29} Detective Reinbolt testified about Tenney's admission of guilt at one point in the investigation. (*Id.* at 294-295.) Among others, Tenney admitted to being alone with the child when some of the injuries occurred. (*Id.* at 303-304.) This information resulted in Tenney's arrest. Prior to Tenney's case coming to trial, Daley left Ohio. (*Id.* at 301-302.) Detective Reinbolt admitted that Daley

was free to leave the state and that he was not told that he was a suspect in this case. (*Id.* at 302-303.)

**{¶30}** Detective Reinbolt testified about Tenney giving him new information later on in the investigation, when she was represented by an attorney, about leaving the child locked in her room on Saturday, July 9, 2011, while Daley and Tenney left the house to go to Walmart. (*Id.* at 296-297.) Detective Reinbolt then talked about a point of the investigation when Tenney "broke down" during an interview, took some time alone with her attorney, and after that, she disclosed the new information about sexual abuse of S.E.D. by Daley. (*Id.* at 306-309.) Detective Reinbolt explained that it was common in his experience that people would try to hold back details of "the worse stuff." (*Id.* at 311-312.)

**{¶31}** After obtaining the new information, in May 2012, Detective Reinbolt visited the trailer, which was then occupied by new tenants, and photographed the bedroom door, which showed the holes where the hasp was screwed in. (*Id.* at 297-299.) He did not find a vibrator or a choker chain, which were the tools alleged by Tenney to have been used in the sexual abuse. (*Id.* at 309-316.) He did not recover those items in a storage facility where Daley kept his items after he had moved. (*Id.* at 315-316.) No neighbors came forward with any complaints of noise or abuse during Detective Reinbolt's investigation. (*Id.* at 316.) Apart from Tenney's statements, Detective Reinbolt did not discover any other evidence of any sexual assault occurring. (*Id.* at 309.)

{¶32} Detective Reinbolt was present at Tenney's plea and testified that Tenney was not offered or promised anything in exchange for her testimony against Daley. (*Id.* at 295-296.) On cross-examination, Detective Reinbolt confirmed that Tenney changed her original story regarding S.E.D.'s abuse months after her arrest. (*Id.* at 304-305.) She explained "who did what after she entered her pleas to child endangering charges and was given a proffer that nothing she would say would be used against her." (*Id.* at 305-306.) Detective Reinbolt confirmed that during one of the interviews, Tenney stated "that she thought that [Daley] should be punished because she was being punished." (*Id.* at 313.)

{¶33} Robert Daley ("Robert"), Randall Daley's father, testified for the defense, stating that Daley had always been "a good boy" and although he struggled at school, he "never really was in much trouble." (*Id.* at 343-345.) Robert testified that his son had been diagnosed with Asperger's syndrome, which was a form of autism that caused developmental delays and led to being "a follower" who "always had to please" other kids. (*Id.* at 345-348.) This pattern continued into Daley's adult life and transferred into his relationships with women. (*Id.* at 348.) Testifying about Daley's relationship with Tenney, Robert stated, "there was no question in my mind that she was telling him what to do." (*Id.* at 349.) Robert mentioned phone conversations with his son when he could hear Tenney in the background telling Daley what to say. (*Id.* at 349.)

{¶34} Robert testified that, prior to July 2011, Tenney told him that "she was tired of taking care of somebody else's baby, that she wanted the baby to go." (*Id.* at 352-353.) He also testified that on the night of the incident Tenney called him from the hospital saying that S.E.D. had tripped over the dog and was "basically arguing with [him] that she didn't do anything." (*Id.* at 353.) After the incident he had several more conversations with Daley and Tenney, in which both were claiming that they did not harm the child. (*Id.* at 354.) In his last conversation with Tenney prior to her arrest, she told him that Daley had agreed to take the blame. (*Id.* at 354.) According to Robert, after that statement, Tenney did not let him talk to his son "for a week or more." (*Id.* at 355.) Robert testified that his son trusted Tenney's claims that she did not hurt the baby, but after Tenney was arrested, Daley stopped believing her. (*Id.* at 356.)

{¶35} On cross-examination, Robert admitted that he was aware that his son had done things that would be construed by general society as being improper or inappropriate, but he did not believe that Daley was responsible for abusing S.E.D. (*Id.* at 363-364.)

{¶36} Daley testified in his defense. He testified that he had found out after the incidents at issue that S.E.D. was not his daughter, although he had always been suspicious about it. (*Id.* at 377.) He separated from S.E.D.'s mother in late 2010 or early 2011 and started to have visitations with S.E.D. in April 2011, after he moved to Ohio. (*Id.* at 378-381.) On June 15, 2011, Daley and S.E.D.'s

mother entered into an agreement for visitation rights with S.E.D. and he had one visitation with S.E.D. after that, during which no harm to S.E.D. occurred. (*Id.* at 381-382.) The next visitation resulted in the events at issue. (*Id.* at 382.)

{¶37} Daley testified that on July 8, 2011, S.E.D. looked fine when he left her in the trailer with Tenney for a few hours, but when he came back, S.E.D. "looked like she had been crying" and she had "a red mark" on the left side of her face. (*Id.* at 385-386.) Tenney explained to him that S.E.D. fell down and hit the LeapFrog table, and he accepted that explanation. (*Id.* at 386-387.) Daley denied slapping S.E.D. during the feeding on July 8, 2011. (*Id.* at 387-388.) He denied any other incidents on that night or on the next day, Saturday, July 9, 2011, when he was present at the residence all day. (*Id.* at 388.) He denied seeing Tenney punch, hit, or slap, S.E.D. (*Id.* at 388-389.) He denied sexually abusing S.E.D. or tying her wrists with a dog chain. (*Id.* at 389.) He had no explanation for the alleged marks on S.E.D.'s wrists other than a possibility that they were caused by the socks that he had put on S.E.D.'s hands to prevent her from scratching her face. (*Id.* at 388-389.) Daley testified that he never put ropes or chains on S.E.D., but he did not know whether Tenney had ever done so. (*Id.* at 390.)

{¶38} Testifying about July 10, 2011, Daley stated that he had not witnessed anything happen to S.E.D. earlier during the day. (*Id.* at 391.) Daley described that when he gave S.E.D. a bath on that evening, he drew about three to four inches of lukewarm water into the bathtub and "let it cool," after which he

stepped outside to have a cigarette. (*Id.* at 392, 429-430.) Daley testified that Tenney gave S.E.D. the bath while he was outside smoking, and he did not know what occurred during the bath. (*Id.* at 392.) When he returned to the trailer, after five or ten minutes, Tenney was "coming out of the bathroom in the back of the trailer with [S.E.D.] limp, nonresponsive, in her arms." (*Id.* at 392-393.) He did not see whether S.E.D.'s body was red because she was covered with a towel. (*Id.* at 393-394.) They took S.E.D. to the hospital and did not discuss what had happened because Daley was "concentrating on getting [S.E.D.] to the hospital." (*Id.* at 394.) When they arrived in the hospital, Daley told the ER crew that S.E.D. had fallen onto a toy, because that was what he had been told by Tenney. (*Id.* at 394.) Daley admitted that the bruises looked "pretty developed" in the hospital, and they did not look like that before. (*Id.* at 395.)

**{¶39}** Daley admitted that he continued to claim that S.E.D. fell on the LeapFrog table when he was interviewed by the police. (*Id.* at 395-397.) He testified that after returning from the Sheriff's Department, Tenney said to him that she did not want to go to jail or get in trouble for something that did not happen. (*Id.* at 397-398.) At that point, she typed a "fill-in-the-blank letter," which was to be completed by one of them if the other were to be arrested. (*Id.* at 397-398.) Daley rejected as false Tenney's testimony that he was the one who typed in the letter, claiming that the language of the confession was not a typical language he would use. (*Id.* at 398-399.) He filled out the confession letter on

-22-

September 12, 2011, shortly after Tenney was arrested and threatened him with being beaten up "within an inch of [his] life" by someone from Tenney's family or a friend. (*Id.* at 400.)

{¶40} Daley claimed that he had received numerous phone calls from Tenney after her arrest, which she made with calling cards that he had purchased for her. (*Id.* at 400-401.) During some of those phone calls, Tenney attempted to coach Daley into saying that he was at fault and requested that Daley get her out of jail. (*Id.* at 401-402.) Daley testified that he wrote the second confession because Tenney threatened him and dictated the wording in legal terms. (*Id.* at 402-403.) He claimed that he listened to Tenney's requests because he "was not thinking clearly" and he did not realize that he was putting himself in trouble. (*Id.* at 403.) Daley testified that Ginger Bennett, the witness on the handwritten confession, signed a blank piece of paper without knowing what it was for, prior to Daley writing a confession on the paper. (*Id.* at 423-424.) Daley mailed it to Tenney, who was controlling his actions from outside of jail. (*Id.* at 424.) He denied doing the things to which he confessed in the handwritten letter or causing any of the injuries to S.E.D. (*Id.* at 395, 397, 403.)

{¶41} As an explanation as to why he allowed Tenney to control him, Daley responded that he had "always been very easy to manipulate." (*Id.* at 384-385.) He testified that he was not able to "listen to [his] own mind and to do what [he] wanted to do" at that time, due to Tenney's control. (*Id.* at 427.) He testified

that there were times when Tenney had restrained him "like sat on [him] to keep [him] from moving around." (*Id.* at 428.)

{¶42} Testifying about the photographs depicting S.E.D. after her arrival in the hospital, Daley acknowledged the existence of bruises and marks on S.E.D.'s face and stated that he had not seen them prior to taking S.E.D. to the hospital. (*Id.* at 411-413.) Looking at the images, Daley admitted that S.E.D. looked like she was burnt, but he continued to claim that the bathwater was lukewarm on July 10, 2011. (*Id.* at 414-415.) He agreed that the injuries depicted on S.E.D.'s back were inflicted by someone hitting the child, but he did not see those bruises for the entire weekend of July 8 through July 10, 2011. (*Id.* at 416.) Daley claimed that he did not see S.E.D. undressed at all on Sunday, July 10, 2011, and he first realized that the child had all these physical injuries when he was at the hospital. (*Id.* at 417, 422.) Daley admitted that he was taking pain medications, Tramadol during that time, but these medications did not affect his ability to see or perceive things. (*Id.* at 413, 427-428.)

{¶43} Daley agreed that S.E.D. was abused on Sunday, July 10, 2011, when she was in his custody. (*Id.* at 417.) He admitted that he did not protect her. (*Id.* at 405-406, 417-418.) He admitted that in spite of his doubts in the truth of Tenney's story about S.E.D. falling on a toy table or being knocked down by a dog, he did not tell the police or the hospital staff about them until the end of his second interview at the Sheriff's Department. (*Id.* at 419-422.) Daley denied

physically harming S.E.D. during the course of the weekend in July 2011, and denied ever leaving S.E.D. in a trailer alone, locked in a room. (*Id.* at 425, 429.) He confirmed that Tenney had a dog and had a choker chain for the dog. (*Id.* at 407.)

*Conclusion of Trial*

{¶44} Based on the above-described testimony and evidence, the jury found Daley guilty of child endangering in Count I (F3), Count II (F2), Count III (F3), and Count IV (F2). (R. at 32, Jury Verdicts.) With respect to all of these counts the jury further found "that the Defendant's conduct caused serious physical harm to the victim." (*Id.*) The jury found Daley not guilty of Count V: Gross Sexual Imposition (F3). (*Id.*) The jury further found Daley guilty of Count VI: Kidnapping (F1), but with respect to this count the jury found that Daley's conduct was not committed with "sexual motivation." (*Id.*; *See also* Jury Questions and Verdicts Tr. at 6-7.)

{¶45} Counts I and II were considered allied offenses, merged, and upon election by the State, Daley was sentenced on Count II, a second[3] degree felony. (Sentencing Tr. at 4.) Likewise, upon merger of Counts III and IV in the same manner, Daley was sentenced on Count IV, a second degree felony. (*Id.*) The trial court sentenced Daley on "Counts II, IV, and VI – each offense a term of six

---

[3] Although Daley was sentenced on the second degree felonies, and the Indictment, as well as the Jury Verdicts state that Counts II and IV were felonies of the second degree, the Judgment Entry—Sentencing improperly labels these two counts as felonies of the *third* degree. It thus appears that the Judgment Entry—Sentencing includes a clerical mistake. We address this issue further in the end of this opinion.

(6) years in the Ohio Department of Rehabilitations and Corrections, all to be served concurrently with each other." (R. at 37, 43, J. Entry—Sentencing.) Daley now appeals raising four assignments of error:

> **I.** **The trial court erred in admitting testimony concerning a police officer's opinion of the truthfulness of the state's witness.**
>
> **II.** **The trial court erred in instructing the jury on the elements of count 6, kidnapping.**
>
> **III.** **Appellant Randall Daley was denied the effective assistance of counsel.**
>
> **IV.** **The jury's verdicts on counts one through four and six are against the manifest weight of the evidence and must be reversed.**

### *First Assignment of Error—Detective Reinbolt's Testimony Regarding Truthfulness of the State's Witness*

**{¶46}** Daley submits that there were only two eyewitnesses testifying about the events that took place over the weekend of July 8-July 10, 2011: Tenney and Daley. Tenney's testimony was significantly different than Daley's. Therefore, the jury had to decide which of the two accounts regarding the events was more credible. During the questioning of Detective Reinbolt, the prosecutor asked whether Tenney seemed deceptive when describing the sexual incident and the detective responded that she did not. Daley claims that this testimony was improper and that it warrants reversal of all convictions in this case. In order to

respond to Daley's claim, we find it necessary to review the circumstances in which the allegedly improper statement arose.

**{¶47}** Detective Reinbolt was asked by the defense, "What's to stop [Tenney] from making up that whole issue of the sex and the kidnapping?" He responded "There is nothing." (Jury Trial Tr. at 311.) The following exchange then occurred between the State and Detective Reinbolt:

> Q:   You've been trained in identifying deception in people that you deal with, haven't you?
>
> A:   Correct.
>
> Q:   Did Ms. Tenney display or demonstrate, during the course of that portion of the interview where she revealed the sexual incident, did she demonstrate behaviors indicating that she was being deceptive?
>
> A:   No.  No, she did not.

(*Id.* at 311-312.)

**{¶48}** No objection was made to this questioning. However, this exchange was followed by recross by the defense counsel:

> Q:   Detective, you interviewed her two times before that.  Was she deceptive with you then?
>
> A:   She wasn't totally -- correct, yes.  Towards everything, yes.
>
> Q:   She lied on two occasions about everything, if you believe what she said the last time.  However, what -- what brings that down to that's believable and the other stuff was not believable?
>
> * * *

A: What makes the difference at that point in time, I believe is that, there was -- she's not getting any -- there's no reason for her now to hold back, to hold anything. It's not gonna get her anything better or anything less. She's now been -- she has, uhm, admitted her wrong. She's been found guilty. So whatever she says, she could go to the grave and not say anything. It's not gonna make it any better or worse for her. So I believe generally -- generally believe that, in her heart, she wanted to clear her conscious [sic] of everything and get everything out because at that point in time, she knew only one side of the story was being told and heard by the State.

(*Id.* at 312-313.)

**{¶49}** It is a general rule that a witness cannot express an opinion regarding the truthfulness of another witness. *See State v. Boston*, 46 Ohio St.3d 108, 128-29, 545 N.E.2d 1220 (1989); *State v. Bump*, 3d Dist. Logan No. 8-12-04, 2013-Ohio-1006, ¶ 82; *State v. Hensley*, 6th Dist. Lucas No. L-03-1005, 2005-Ohio-664, ¶ 38.

When a witness expresses an opinion as to the veracity of another witness, it has the effect of acting as a "litmus test" on the key issue in the case and infringing on the role of the fact finder, "who is charged with making determinations of veracity and credibility." This is particularly true when an investigating police officer expresses an opinion as to whether a witness is being truthful.

*Hensley*, 2005-Ohio-664, at ¶ 38, quoting *Boston*, 46 Ohio St.3d at 128-129, *and citing State v. Young,* 8th Dist. Cuyahoga No. 79243, 2002-Ohio-2744, ¶ 70-72. Therefore, it would be improper for Detective Reinbolt to testify that Tenney was a credible witness.

-28-

{¶50} Nevertheless, Detective Reinbolt's testimony differed from the prohibited "opinion as to the veracity of another witness." Detective Reinbolt did not testify that Tenney was truthful or not deceptive but rather, that she did not "display or demonstrate * * * behaviors indicating that she was being deceptive" when she revealed "the sexual incident." (Jury Trial Tr. at 312.) Testimony based on the perception of a witness is within the scope of permissible lay opinion testimony under Evid.R. 701. *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 119. Here, Detective Reinbolt testified about Tenney's *behavior* as he perceived it when she was describing "the sexual incident." (Jury Trial Tr. at 312.) This testimony did not rise to the level of expressing an opinion as to the veracity of Tenney and as such, was not improper. *See Davis*, 2008-Ohio-2, at ¶¶ 116-120 (holding that a lay witness's testimony that another witness was "very non-committal, very wishy washy," was not an improper description of the witness's demeanor that was relevant in showing evasiveness).

{¶51} Even were we to accept Daley's contention that Detective Reinbolt's testimony about Tenney's behavior should have been excluded, Daley failed to object to this allegedly improper testimony at trial. As a result, he waived all but plain error. *Davis*, 2008-Ohio-2, at ¶ 116, citing *State v. Childs*, 14 Ohio St.2d 56, 236 N.E.2d 545 (1968), paragraph three of the syllabus. "[A]n alleged error 'does not constitute a plain error or defect under Crim.R. 52(B) unless, but for the error, the outcome of the trial clearly would have been otherwise.' " *State v. Murphy*, 91

Ohio St.3d 516, 532, 2001-Ohio-112, 747 N.E.2d 765, quoting *State v. Campbell*, 69 Ohio St.3d 38, 41, 1994-Ohio-492, 630 N.E.2d 339, *and State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus. "The appellate court must examine the error asserted by the defendant-appellant in light of all of the evidence properly admitted at trial and determine whether the jury would have convicted the defendant even if the error had not occurred." *State v. Slagle*, 65 Ohio St.3d 597, 605, 605 N.E.2d 916 (1992).

{¶52} A review of the testimony and the evidence properly admitted at trial brings a conclusion that Detective Reinbolt's statement that Tenney did not "demonstrate behaviors indicating that she was being deceptive" did not affect the outcome of the trial. (Jury Trial Tr. at 312.) First, this opinion referred to the specific "portion of the interview where [Tenney] revealed the sexual incident," and not to Tenney's credibility on the stand or her truthfulness as a whole. (*Id.* at 312.) Therefore, no prejudice can be claimed with respect to Counts I-IV, on which the testimony about the sexual incident had no bearing. Second, Detective Reinbolt was subject to cross-examination, during which the defense was able to induce his admission that Tenney had lied previously. This further shows that the jury was not improperly influenced with respect to any count by the detective's statements about Tenney's lack of display of deceptive behavior. Third, Tenney testified and was subject to cross-examination, giving the jury an opportunity to assess for themselves whether she was deceptive in her account of the sexual

incident. Hence, there was no prejudice in allowing Detective Reinbolt's testimony, even if it was improper, and the error, if any, was harmless. *See Bump*, 2013-Ohio-1006, ¶¶ 83-85.

{¶53} Concluding, Detective Reinbolt's testimony did not impermissibly infringe on the role of the fact finder and it did not clearly affect the outcome of the trial. As such, Daley's first assignment of error is overruled.

*Second Assignment of Error—Kidnapping Instructions*

{¶54} In his second assignment of error Daley submits that the trial court erred by giving insufficient jury instructions on Count VI, Kidnapping. The finding of kidnapping, pursuant to the Indictment, required proof of the following

> On or about the 10th day of July, 2011 , in Seneca County, Ohio, RANDALL J. DALEY did in the case of S.E.D., a victim under the age of thirteen, by any means, restrain the liberty of S.E.D., with purpose to engage in sexual activity, as defined in Section 2907.01 of the Revised Code with the said S.E.D. against S.E.D.'s will.

(R. at 10, Amended Indictment.)

{¶55} The trial court gave the following instructions on this count:

> Here now is Count Six, which is titled Kidnapping. Before you can find the Defendant guilty, you must find, on or -- you must find beyond a reasonable doubt, on or about the 10th day of July, 2011, in Seneca County, the defendant restrained the victim of her liberty for the purpose of engaging in sexual activity while -- with the victim against her will.
>
> And the definitions. "To restrain one of his or her liberty" means to limit or restrain the victim's freedom of movement. The restraint need not be any -- for any specific duration of time or in any specific manner.

> "Sexual activity" means sexual conduct or sexual contact or both.
>
> And then "sexual contact," again, means any touching of an erogenous zone of another, including without limitation, thigh, genitals, buttock, pubic region, or if the person's a female, a breast, for the purpose of sexually arousing or gratifying either person.

(Jury Trial Tr. at 469-470.) The instructions lacked an essential element of the kidnapping charge because the trial court did not include the language from the Indictment requiring that the victim be under the age of thirteen. The State concedes the error.

{¶56} "As a general rule, a defendant is entitled to have the jury instructed on all elements that must be proved to establish the crime with which he is charged." *State v. Adams*, 62 Ohio St.2d 151, 153, 404 N.E.2d 144 (1980). Nevertheless, the trial court's error in this regard does not "necessarily require reversal of a conviction." *Id.*, at paragraph two of the syllabus.

{¶57} "On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." Crim.R. 30(A). Daley acknowledges that he did not object to the defective instructions at trial. As a result, he waived all but plain error. *State v. Underwood*, 3 Ohio St.3d 12, 444 N.E.2d 1332 (1983), syllabus; *Adams*, 62 Ohio St.2d at 153. Daley asserts that the plain error occurred because by failing to properly instruct the jury, the trial court "made an impermissible judicial finding

of fact – that the victim was in fact under the age of thirteen." (Appellant Br. at 13.) But "[f]ailure of a trial court to separately and specifically instruct the jury on every essential element of each crime with which an accused is charged does not per se constitute plain error under Crim.R. 52(B)." *Adams*, 62 Ohio St.2d 151, at paragraph two of the syllabus.

{¶58} In order to determine whether plain error occurred we must examine the record and we will only reverse the conviction if we decide that "substantial prejudice may have been visited on the defendant, thereby resulting in a manifest miscarriage of justice." *Adams*, 62 Ohio St.2d at 154; *Long*, 53 Ohio St.2d at 97. We do not find that a manifest miscarriage of justice occurred because our review of the record discloses that the age of the victim was not a disputed fact in this case. Daley himself acknowledged the young age of S.E.D. when testifying that he married S.E.D.'s mother in 2009 when she was pregnant with S.E.D. (Jury Trial Tr. 376.) Other witnesses testified that S.E.D. was twenty-two months old at the time of the offense. (*See, e.g.*, *id.* at 144). Multiple photographs of the child depicting her condition on July 10, 2011, were submitted into evidence, from which the jury could determine that S.E.D. was definitely under the age of thirteen. (*Id.* at 155-168, 328.)

{¶59} Furthermore, the jury verdict form stated, "We the jury, being duly impaneled, find the Defendant "Guilty" of Kidnapping *as set forth in Count VI of the Indictment*." (R. at 32.) Thus, the jury verdict form referred to the Indictment,

which included the proper language, as quoted above. We also note that the age of the child has no effect on the level of the felony for kidnapping and has no effect on the sentence imposed unless the offender is also found guilty of the sexual motivation specification. *See* R.C. 2905.01(C)(1) and (C)(3)(a).[4] Accordingly, the element that was missing from the jury instructions had no effect on the level of the felony of which Daley has been found guilty or on the sentence imposed.

**{¶60}** Concluding, the outcome of the trial clearly would not have been different if proper instructions had been given. *See Murphy*, 91 Ohio St.3d at 532. For that reason, we hold that no manifest miscarriage of justice resulted from the trial court's defective instructions on the count of kidnapping. We agree that the trial court erred by failing to fully instruct the jury. Nevertheless this omission did not result in plain error and therefore, the second assignment of error is overruled.

---

[4] R.C. 2905.01(C), states:

> (C)(1) Whoever violates this section is guilty of kidnapping. Except as otherwise provided in this division or division (C)(2) or (3) of this section, kidnapping is a felony of the first degree. Except as otherwise provided in this division or division (C)(2) or (3) of this section, if an offender who violates division (A)(1) to (5), (B)(1), or (B)(2) of this section releases the victim in a safe place unharmed, kidnapping is a felony of the second degree.

> * * *

> (3) If the victim of the offense is less than thirteen years of age and if the offender also is convicted of or pleads guilty to a sexual motivation specification that was included in the indictment, count in the indictment, or information charging the offense, kidnapping is a felony of the first degree, and, notwithstanding the definite sentence provided for a felony of the first degree in section 2929.14 of the Revised Code, the offender shall be sentenced pursuant to section 2971.03 of the Revised Code as follows:

> (a) Except as otherwise provided in division (C)(3)(b) of this section, the offender shall be sentenced pursuant to that section to an indefinite prison term consisting of a minimum term of fifteen years and a maximum term of life imprisonment.

### *Third Assignment of Error—Ineffective Assistance of Counsel*

{¶61} Daley claims that his counsel was ineffective because he failed to object to the State's allegedly improper questioning of Detective Reinbolt (see the first assignment of error). He further claims that his counsel was ineffective by failing to object to the defective instructions on the kidnapping charge (see the second assignment of error). He claims that the counsel's failures warrant a reversal of all convictions.

{¶62} In order to prevail on a claim of ineffective assistance of counsel, a criminal defendant must show first, that the counsel's performance was deficient in that it fell "below an objective standard of reasonable representation." *State v. Keith*, 79 Ohio St.3d 514, 534, 1997-Ohio-367, 684 N.E.2d 47. Second, the defendant must show "that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." *Id.*, citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to demonstrate prejudice, the defendant must prove a reasonable probability that the result of the trial would have been different but for his or her counsel's errors. *Id.*

{¶63} "[F]ailure to object to error, alone, is not enough to sustain a claim of ineffective assistance." *State v. Campbell*, 69 Ohio St.3d 38, 52-53, 1994-Ohio-492, 630 N.E.2d 339, quoting *State v. Holloway*, 38 Ohio St.3d 239, 244, 527 N.E.2d 831 (1988). It may well have been the trial counsel's strategy to not object to the questioning of Detective Reinbolt on the issue of Tenney's deceptiveness

after the counsel suggested that Tenney had made up some of the issues. Furthermore, we have already determined that Detective Reinbolt's testimony was not improper and did not prejudice Daley. (See our resolution of the first assignment of error.) Consequently, Daley's trial counsel was not ineffective by failing to object to Detective Reinbolt's testimony.

{¶64} Likewise, our resolution of the second assignment of error leads us to conclude that the trial counsel was not ineffective by failing to object to the defective instructions on the charge of kidnapping. Although those instructions were incomplete, Daley was not deprived of a fair trial as a result. Thus, the test for ineffective assistance of counsel is not satisfied here.

{¶65} For the foregoing reasons, Daley's third assignment of error is overruled.

### *Fourth Assignment of Error—Manifest Weight of the Evidence*

{¶66} Daley claims that the jury's verdicts on all the counts on which he was found guilty were against the manifest weight of the evidence. The question of manifest weight of the evidence concerns an "effect in inducing belief" and as such, it is not subject to a mathematical analysis. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541. When reviewing a conviction challenged for the manifest weight of the evidence, an appellate court acts as a "thirteenth juror" and may disagree with the jury's resolution of the conflicting testimony. *Id.*, quoting *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72

L.Ed.2d 652 (1982). But the appellate court must give due deference to the findings of the jury, because

> [t]he fact-finder occupies a superior position in determining credibility. The fact-finder can hear and see as well as observe the body language, evaluate voice inflections, observe hand gestures, perceive the interplay between the witness and the examiner, and watch the witness's reaction to exhibits and the like. Determining credibility from a sterile transcript is a Herculean endeavor. A reviewing court must, therefore, accord due deference to the credibility determinations made by the fact-finder.

(Alterations omitted.) *State v. Dailey*, 3d Dist. Crawford, No. 3-07-23, 2008-Ohio-274, ¶ 7, quoting *State v. Thompson*, 127 Ohio App.3d 511, 529, 713 N.E.2d 456 (8th Dist.1998). Therefore, an argument that a conviction is against the manifest weight of the evidence will only succeed if the appellate court finds that "in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶67} Daley presents two reasons for this assignment of error. First, he cites certain inconsistencies that the State's main witness, Tenney, disclosed in her testimony. Daley argues that in view of these inconsistencies, the jury clearly lost its way in believing Tenney.

{¶68} The jury, as the trier of facts, "may believe or disbelieve any witness or accept part of what a witness says and reject the rest." *State v. Antill*, 176 Ohio

St. 61, 197 N.E.2d 548 (1964); *State v. Davis*, 3d Dist. Marion No. 9-06-56, 2007-Ohio-4741, ¶ 40. Consequently, a conviction will not be against the manifest weight of the evidence simply because the jury believed some, but not all of the witness's testimony. Therefore, we do not find that the jury clearly lost its way by believing some, but not all of Tenney's testimony. Nevertheless, this conclusion does not end our inquiry because we must still determine whether the jury's resolution of the conflicting testimony was so manifestly improper that the conviction must be overturned.

{¶69} The convictions for child endangering in Counts I and III required a finding that (1) Daley was "the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age"; (2) Daley created "a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support"; and (3) his actions resulted "in serious physical harm to the child involved." R.C. 2919.22(A), (E)(2)(c).

{¶70} The first element was supported by ample evidence and it was not disputed. As to the second element, Daley admitted that he did not protect S.E.D. on the weekend of July 8-July 10, 2011, and failed to inform the police or the hospital about his suspicions that S.E.D. was harmed by Tenney. Daley acknowledged the existence of bruises and marks on S.E.D.'s face and body and agreed with a conclusion that S.E.D. was abused while in his custody, thus also

-38-

satisfying the third element of the above charge. Additionally, Tenney testified that Daley left S.E.D. locked in a room alone while leaving home and claimed that Daley never stopped her from abusing S.E.D. The age of the bruises and other injuries showed that the violation of a duty of care, protection, or support occurred more than once during the time at issue. Daley's testimony supporting the conviction for child endangering in Counts I and III and the additional evidence presented in the case preclude a finding that the jury verdict with respect to these counts was against the manifest weight of the evidence.

{¶71} The convictions for child endangering in Counts II and IV required a finding that (1) Daley abused a child who was "under eighteen years of age or [was] a mentally or physically handicapped child under twenty-one years of age," and (2) it resulted "in serious physical harm to the child involved." R.C. 2919.22(B)(1), (E)(2)(d).

{¶72} Here, the age of the child and the serious physical harm were not disputed. With respect to abuse, there were two confession letters in which Daley admitted to having abused S.E.D. But on the stand Daley denied ever abusing S.E.D. or causing the harm, and claimed that the confession letters did not state the truth. In contrast, Tenney testified about several instances of child abuse by Daley. Although Tenney admitted to causing some of the injuries herself, she claimed that both she and Daley were responsible for putting S.E.D. in hot water and shoving her into stuff, more than once. She testified about specific instances

of abuse on July 8 and July 9, 2011, as well as multiple other "minor" incidents. No evidence was presented as to alternative causes for marks on S.E.D.'s wrists, burns over her body, and for many of the other injuries, while Daley's claim that the injuries were caused by accident was expressly contradicted by the testimony of Susan Turner. Therefore, the jury had to determine whether to believe Daley or Tenney, who both gave inconsistent statements to the hospital staff and to the police throughout the various stages of the investigation. As we stated above, the jury was allowed to believe or disbelieve any statements given by the witnesses. We do not find that the jury's believing the prosecution witness over the defense in the absence of alternative causes for S.E.D.'s injuries created such a manifest miscarriage of justice that the convictions in Counts II and IV must be overturned.

{¶73} The conviction for kidnapping in Count VI required a finding that Daley, (1) "in the case of a victim under the age of thirteen or mentally incompetent, by any means" (2) removed S.E.D. from the place where she was found or restrained the liberty of S.E.D., (3) with the purpose "[t]o engage in sexual activity, as defined in section 2907.01 of the Revised Code, with [S.E.D.] against [S.E.D.'s] will." R.C. 2905.01(A)(4).

{¶74} Here, elements two and three are at issue. The State argued that Daley restrained S.E.D. by tying her hands and holding her down with his legs. The photographs admitted into evidence showed marks on S.E.D.'s wrists and the nurse testified about observing similar marks, which looked like "ligature marks"

as if "somebody had tied her down." (Jury Trial Tr. at 334-336.) Tenney testified that she witnessed Daley having S.E.D.'s wrists tied with a dog chain and holding her down with his legs while engaging in a sexual behavior. Apart from denying Tenney's version of events, the defense did not present any evidence to contradict her statement or to show an alternative cause of the "ligature marks." The photographs also showed bruises on S.E.D.'s legs, for which there were no explanations that would contradict the possibility that Daley held S.E.D. down with his legs. Therefore, there was sufficient evidence that S.E.D. was restrained and no evidence to the contrary apart from Daley's denials.

{¶75} With respect to the third element of this claim, the only evidence that Daley's purpose for restraining S.E.D. was to engage in sexual activity came from Tenney's testimony and was contradicted by Daley's testimony. Defense argued that Tenney lied when describing the sexual events; while the State attempted to point out that she had no reason to lie because she was already imprisoned and she was not offered anything for her testimony. Detective Reinbolt did not recover a vibrator among Daley's belongings or in his investigation of the crime scene, which he performed months later, after new tenants had occupied the trailer. No physical evidence was submitted to support or contradict either testimony. In this situation, the jury was charged with sorting the facts. We hold that, in spite of Daley's denial of the accusations, the record fails to establish that the jury's

resolution of the conflicting testimony was so manifestly improper that the conviction must be overturned.

{¶76} As his second contention for this assignment of error, Daley points to the language of the Indictment and argues that the findings of guilty on the charge of kidnapping but not guilty on gross sexual imposition or on the sexual motivation specification show that the jury lost its way. Count V, Gross Sexual Imposition, stated:

> On or about the 10th day of July, 2011, in Seneca County, Ohio, Randall J. Daley *did have sexual contact with* S.E.D., not the spouse of the said defendant, and the said S.E.D. being less than thirteen years of age, whether or not the said Randall J. Daley knows the age of S.E.D.

(Emphasis added.) (R. at 1, Indictment; R. at 10, Amended Indictment.)

Count VI, Kidnapping, stated:

> On or about the 10th day of July, 2011, in Seneca County, Ohio, Randall J. Daley did in the case of S.E.D., a victim under the age of thirteen, by any means, restrain the liberty of S.E.D., *with purpose to engage in sexual activity*, as defined in Section 2907. 01 of the Revised Code with the said S.E.D. against S.E.D.'s will.
>
> SPECIFICATION: The Grand Jurors do further find and specify that Randall J. Daley committed the offense *with a sexual motivation*.

(Emphasis added.) (*Id.*)

{¶77} Daley reasons that the jury's finding of guilty on the charge of kidnapping, which required that he restrained the liberty of S.E.D. with the purpose to engage in sexual activity, is inconsistent with its finding that he did not

commit the offense "with a sexual motivation" and the finding of not guilty of gross sexual imposition. (*Id.*) He argues that the jury's findings are inconsistent, showing that the jury lost its way with regard to the kidnapping conviction.

**{¶78}** We begin by rejecting Daley's argument that the finding of not guilty on Count V, Gross Sexual Imposition, precludes the finding of guilt on Count VI, Kidnapping with a purpose to engage in sexual activity. For the purpose of the specific statutory section charged in this case, kidnapping required only *the purpose* to engage in sexual activity regardless of whether or not the sexual activity actually took place. *State v. Colegrove*, 123 Ohio App.3d 565, 568, 704 N.E.2d 645 (8th Dist.1998). Accordingly, these findings are not inconsistent.

**{¶79}** Furthermore,

[C]onsistency between the verdicts on the several counts of an indictment * * * is unnecessary where defendant is convicted on one or some counts but acquitted on others, and the conviction will generally be upheld irrespective of its rational incompatibility with the acquittal.

The several counts of an indictment containing more than one count are not interdependent. A verdict responding to a designated count will be construed in the light of the count designated, and no other. An inconsistency in a verdict does not arise out of inconsistent responses to different counts, but only arises out of inconsistent responses to the same count.

*State v. Adams*, 53 Ohio St.2d 223, 228, 374 N.E.2d 137 (1978), *vacated on other grounds*, 439 U.S. 811, 99 S.Ct. 69, 58 L.Ed.2d 103 (1978); *accord Dunn v. United States*, 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356 (1932); *see also*

*United States v. Powell*, 469 U.S. 57, 63-64, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984)

(criticizing courts that carved exceptions to the *Dunn* rule).

> [W]here truly inconsistent verdicts have been reached, "[t]he most that can be said ... is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt." [*State v.*] *Dunn, supra,* 284 U.S. [390, 393], 52 S.Ct. [189, 190, (1932)]. * * * It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense. * * *

> Given this uncertainty, and the fact that the Government is precluded from challenging the acquittal, it is hardly satisfactory to allow the defendant to receive a new trial on the conviction as a matter of course. * * * For us, the possibility that the inconsistent verdicts may favor the criminal defendant as well as the Government militates against review of such convictions at the defendant's behest. * * *

> The fact that the inconsistency may be the result of lenity, coupled with the Government's inability to invoke review, suggests that inconsistent verdicts should not be reviewable.

> We also reject, as imprudent and unworkable, a rule that would allow criminal defendants to challenge inconsistent verdicts on the ground that in their case the verdict was not the product of lenity, but of some error that worked against them. Such an individualized assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake. * * *

>    * * *

> Whether presented as an insufficient evidence argument, or as an argument that the acquittal on the predicate offense should collaterally estop the Government on the compound offense, the argument necessarily assumes that the acquittal on the predicate offense was proper—the one the jury "really meant." This, of course,

is not necessarily correct; all we know is that the verdicts are inconsistent.

\* \* \* [T]he best course to take is simply to insulate jury verdicts from review on this ground.

*Powell*, 469 U.S. at 64-68. Accordingly, even if the finding of not guilty on Count V were inconsistent with the guilty verdict on Count VI, this inconsistency would not be a proper basis for a reversal.

{¶80} Likewise, the finding of not guilty on a specification does not undermine the verdict on a principal charge, as long as the principal charge is supported by the evidence. This rule has been consistently applied by the appellate courts in Ohio. *See State v. Smith*, 8th Dist. Cuyahoga No. 88371, 2008-Ohio-3657, ¶¶ 58-60; *State v. Gardner*, 2nd Dist. Montgomery No. 21027, 2006-Ohio-1130, ¶ 32; *State v. Allen*, 1st Dist. Hamilton No. C-060239, 2006-Ohio-6822, ¶ 32; *State v. Dearmitt*, 9th Dist. Wayne No. 96CA0021, 1997 WL 33290, \*3 (Jan. 15, 1997); *State v. Burton*, 6th Dist. Sandusky No. S-95-008, 1996 WL 139531, \*5 (Mar. 8, 1996); *State v. Woodson*, 24 Ohio App.3d 143, 493 N.E.2d 1018 (10th Dist.1985). Although this rule may seem counterintuitive, it stems from the reasoning that "[s]pecifications are considered after, and in addition to, the finding of guilt on the principal charge." *State v. Perryman*, 49 Ohio St.2d 14, 26, 358 N.E.2d 1040 (1976), *vacated on other grounds,* 438 U.S. 911, 98 S.Ct. 3136, 57 L.Ed.2d 1156 (1978). We followed this reasoning in *State v. Echols*, 3d Dist. Seneca No. 13-95-17, 1995 WL 614062 (Oct. 17, 1995), where the defendant

argued that his conviction was "inconsistent, inappropriate, and against the manifest weight of the evidence because the jury found him guilty of aggravated robbery but did not find that he had a firearm on or about his person or under his control while committing the offense." *Id.* In affirming the conviction, we quoted *Perryman*'s syllabus,

> Where a jury convicts a defendant of an aggravated murder committed in the course of an aggravated robbery, and where that defendant is concurrently acquitted of a specification indicting him for identical behavior, the general verdict is not invalid.

*Id.*

{¶81} Our reasoning here can further be supported by the principle that in a criminal case, the finding of "not guilty" is not the same as an affirmative finding that the defendant did not commit the act. The acquittal does not establish innocence. *State ex rel. Jones v. Suster*, 84 Ohio St.3d 70, 72, 1998-Ohio-275, 701 N.E.2d 1002; *Massey v. State*, 1st Dist. Hamilton No. C-010325, 2002-Ohio-718; *Zonnie Enterprises, Inc. v. State of Ohio*, 8th Dist. Cuyahoga No. 41468, 1980 WL 355064 (Sept. 25, 1980).

{¶82} Therefore, whether a product of leniency or a mistake (*see Powell*, *supra*, at 64-68), the jury's determination that the kidnapping was not "committed with sexual motivation" does not impact its finding that it was committed with a purpose to engage in sexual activity, as long as the kidnapping charge is supported by the evidence. *See State v. Kimbrough*, 8th Dist. Cuyahoga No. 76517, 2000

WL 1195671, *3-4 (Aug. 17, 2000) (rejecting a challenge identical to the one alleged by Daley); *Smith*, 2008-Ohio-3657, at ¶¶ 57-61 ("The fact that the jury found appellant not guilty of the sexual motivation specification cannot be considered when evaluating his kidnapping conviction."). Having already determined that the kidnapping conviction in Count VI was supported by evidence and was not against the manifest weight of the evidence, we hold that the jury did not lose its way by finding Daley guilty of kidnapping.

{¶83} For all of the above reasons, we overrule the fourth assignment of error.

### *Errors in the Sentencing Judgment Entry*

{¶84} Although the parties have not raised this issue on appeal, in our review of the record we have identified errors in the sentencing judgment entry, which we feel compelled to raise sua sponte. The first error relates to the degrees of felonies in counts two and four, which the sentencing journal entry labels as the felonies of the third degree, even though they were felonies of the second degree. The second error concerns the Revised Code Section entered next to the kidnapping conviction, which includes subsection for sexual motivation specification, even though Daley was not found guilty of the specification.

{¶85} As recited in the factual section of this opinion, counts one and three of the Indictment charged Daley with endangering children, a felony of the third degree in violation of R.C. 2919.22(A),(E)(2)(c); counts two and four charged

Daley with endangering children, a felony of the *second* degree in violation of R.C. 2919.22(B)(1 ),(E)(2)(d). (R. at 10, Amended Indictment.) The jury verdict forms state that Daley was found guilty of the third degree felonies of child endangering in counts one and three, and guilty of the *second* degree felonies of child endangering in counts two and four. (R. at 32, Jury Verdicts.) The verdicts further state that Daley was found *not guilty* of the sexual motivation specification. (*Id.*) The judge did not refer to the degrees of the felonies when reading the verdicts to Daley at the conclusion of trial, but did state that in Count six the jury "does not find sexual motivation." (Jury Questions and Verdicts Tr. at 6-7, Apr. 18, 2013.)

{¶86} At the sentencing hearing the following exchange occurred:

THE COURT: Thank you. The case is set for sentencing today. By jury verdict, Mr. Daley was found guilty of Count 1 and 2 Child Endangering, *one a felony of the third degree, one a felony of the second degree*. Counts 3 and 4, Mr. Daley was found guilty of Child Endangering, *a third degree and second* degree felony. Also, he's found guilty of kidnapping in Count 6 *with no sexual motivation specification*.

The attorneys agreed during the trial that there needed to be a merger of offenses and then a selection by the Prosecutor of which counts he wished to proceed to sentencing on. So, Mr. DeVine, as counts 1 and 2, which would you elect to be sentenced upon?

MR. DEVINE: We elect to proceed with sentencing on felonies of the *second* degree, your Honor.

THE COURT: Counts 2 and 4, correct?

MR. DEVINE: Yes.

(Sentencing Tr. at 4, May 30, 2013.).

**{¶87}** After the prosecutor, the defendant, and the victim's advocate made their statements, the trial court imposed the sentence as follows.

> That being said, I'll impose on Count 2 a six-year prison sentence in the Ohio Department of Rehabilitation and Correction and Count 4 I'll impose a six-year prison sentence in the Ohio Department of Rehabilitation and Correction. On Count 6, I'll impose a six-year prison sentence in the Ohio Department of Rehabilitation and Corrections. All those sentences to be served concurrently with each other for a total six-year sentence

(*Id.* at 21-22.)

**{¶88}** Up until this point, it was clear that in counts two and four, Daley was charged with, found guilty of, and sentenced for child endangering, a felony of the *second* degree. It also appeared clear that Daley was found *not guilty* of the sexual motivation specification. The sentencing judgment entry, however, states as follows.

> This matter came on for sentencing, the Defendant having previously been found Guilty by jury verdict of the following offenses: Count I: Child Endangering; a third degree felony, contrary to R.C. 2919.22(A),(E)(2)(c); *Count II: Child Endangering, a third degree felony*, contrary to R.C. 2919.22(B)(l),(E)(2)(d); Count III: Child Endangering, a third degree felony, contrary to R.C. 2919.22(A),(E)(2)(c); *Count IV: Child Endangering, a third degree felony*, contrary to R.C. 2919.22(B)(l),(E)(2)(d); Count VI: Kidnapping, a first degree felony, contrary to R.C. 2905.01(A)(4),*(C)(3)(a)*.

(Emphasis added.) (R. at 37, J. Entry—Sentencing, June 4, 2013.) The sentencing entry has been corrected by a nunc pro tunc judgment entry on June 21, 2013,

which corrected only the name of the county that was to be reimbursed according to the judgment entry, but did not address the mistakes we are discussing here. (R. at 43, nunc pro tunc J. Entry—Sentencing, at 3, June 21, 2013.)

{¶89} The sentencing judgment entries thus incorrectly indicate that all counts of child endangering were felonies of the third degree, contrary to the Indictment, the jury verdicts, and the sentencing transcript, which state that counts two and four are felonies of the second degree. It is also contrary to the State's affirmative election to sentence Daley on counts two and four, second-degree felonies. Everything in the record indicates that the trial court intended to and did sentence Daley on the second degree felonies of child endangering. Furthermore, the sentences imposed on counts two and four match a second-degree felony (three to eight years) and do not fit within the guidelines for the third degree felony sentencing (twelve to thirty-six months). *See* R.C. 2929.14(A)(2) and (A)(3)(b). It thus clearly appears that the Judgment Entry—Sentencing includes a clerical mistake when it labels counts two and four as felonies of the third degree.

{¶90} Additionally, the sentencing entry in count VI: Kidnapping, includes division (C)(3)(a) of R.C. 2905.01, which is the division that sets forth the

language for sexual motivation specification.[5]  This is contrary to the jury verdicts as written and signed by the jury and as read by the trial court to Daley, and also contrary to the sentencing transcript, all of which clearly state that Daley was found *not guilty* of the sexual motivation specification.  There is nothing in the record to indicate that the trial court intended to sentence Daley on kidnapping with the sexual motivation specification.  The prison term prescribed matches kidnapping as a felony of the first degree, *without* the sexual motivation specification (three to eleven years), and does not match kidnapping as a first degree felony *with* a sexual motivation specification ("indefinite term consisting of a minimum term of fifteen years and a maximum term of life imprisonment").  R.C. 2905.01(C)(3)(a).  It thus clearly appears that the Judgment Entry—Sentencing includes a clerical mistake when it includes division (C)(3)(a) of R.C. 2905.01 next to the kidnapping conviction.

{¶91} Because the errors are clearly clerical, they do not require that Daley be resentenced.  Rather, a nunc pro tunc entry will properly cure the errors.  We therefore direct the trial court to issue a nunc pro tunc entry to correct the

---

[5] R.C. 2905.01(C)(3) states:

> If the victim of the offense is less than thirteen years of age and if the offender also is convicted of or pleads guilty to a sexual motivation specification that was included in the indictment, count in the indictment, or information charging the offense, kidnapping is a felony of the first degree, and, notwithstanding the definite sentence provided for a felony of the first degree in section 2929.14 of the Revised Code, the offender shall be sentenced pursuant to section 2971.03 of the Revised Code as follows:

> (a) Except as otherwise provided in division (C)(3)(b) of this section, the offender shall be sentenced pursuant to that section to an indefinite prison term consisting of a minimum term of fifteen years and a maximum term of life imprisonment.

sentencing judgment entry pursuant to Crim.R. 36(A), so that it reflects what the court actually decided. *State ex rel. Mayer v. Henson*, 97 Ohio St.3d 276, 2002-Ohio-6323, 779 N.E.2d 223, ¶ 14, quoting *State ex rel. Fogle v. Steiner*, 74 Ohio St.3d 158, 164, 1995-Ohio-278, 656 N.E.2d 1288 ("nunc pro tunc entries 'are limited in proper use to reflecting what the court actually decided, not what the court might or should have decided or what the court intended to decide' ").

*Conclusion*

{¶92} Having reviewed the arguments, the briefs, and the record in this case, we find no error prejudicial to Appellant in the particulars assigned and argued. The judgment of the Court of Common Pleas in Seneca County, Ohio is therefore affirmed and the matter is remanded for further proceedings consistent with this opinion.

*Judgment Affirmed*
*Cause Remanded*

**SHAW and PRESTON, J.J., concur.**

**/jlr**